## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

MICHAEL HARTY, individually and on
behalf all others similarly situated,

               Plaintiff,

    v.

SPARK ENERGY, LLC,

               Defendant.

Civil Action No.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

Plaintiff Michael Harty ("Plaintiff") brings this action against Spark Energy, LLC ("Defendant" or "Spark Energy"), by and through his attorneys, individually and on behalf of all others similarly situated, and alleges with personal knowledge as to his own actions, and upon information and belief as to those of others, as follows:

### NATURE OF THE CASE

1.    This action seeks to redress Spark Energy's deceptive, bad faith, and unfair pricing practices that have caused thousands of consumers to pay considerably more for their electricity than they should otherwise have paid.

2.    Defendant engages in a classic bait-and-switch deceptive and unfair marketing scheme aimed at consumers hoping to save on the cost of electricity. It lures consumers into switching electricity providers by offering an initial fixed rate for a limited number of months that is lower than local utility electricity rates. Once that initial rate expires, Spark Energy switches its customers to a "competitively priced" "variable market rate" that "may vary according to market conditions." In reality, Defendant's variable rates are substantially higher

than those otherwise available in the electricity market, and its rates do not reflect changes in market conditions for the electricity it supplies to its retail customers. Spark Energy further deceives its variable rate customers by charging them monthly administrative fees in direct contravention of the terms of Spark Energy's customer contract. As a result, unsuspecting consumers are being fleeced millions of dollars in exorbitant charges for electricity. Defendant's scheme, which often affects Illinois' most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

3.      This suit is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*, and the common law on behalf of a class of Spark Energy residential customers in Illinois who were charged a variable rate for electricity by Spark Energy from March 2009 to the present. This suit seeks, *inter alia*, injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

4.      Plaintiff Michael Harty is a citizen of Illinois residing in Mount Prospect, Illinois. Mr. Harty was a Spark Energy customer for electricity from approximately February 2012 to approximately November 2018 (when Plaintiff realized that he was being overcharged). As a result of Defendant's deceptive and unfair conduct, Plaintiff incurred excessive charges for electricity.

5.      Defendant Spark Energy, LLC is a limited liability company organized under the laws of Texas, with its principal place of business in Texas. Defendant is an alternative retail energy supplier, providing electricity services to residential customers in the United States, including Illinois, where Defendant is currently licensed to operate. Defendant has tens of

thousands of customers in Illinois, and tens of millions of dollars in revenues. Defendant previously operated as Spark Energy, LP in Illinois and other states.

## JURISDICTION

6.     Defendant's status as limited liability company renders it an "unincorporated association" pursuant to the Class Action Fairness Act ("CAFA"), and under CAFA, an unincorporated association is a citizen of the state where it has its principal place of business and the state under whose laws it is organized. *See* 28 U.S.C. § 1332(d)(10).

7.     Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

## OPERATIVE FACTS

8.     In 2002, Illinois made the decision to deregulate the market for retail residential electricity supply. Among the goals of the reorganization were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates. As a result, the State's electricity industry is open to competition, and consumers may choose their energy supplier.

9.     The new energy suppliers, who compete against local utilities such as Commonwealth Edison ("ComEd"), are known as alternative retail electric suppliers or "ARESs." While ARES supply the electricity, local utilities continue to deliver the commodity to consumers' homes. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ARES sets the price for the customer's energy supply.

10.     The public policy motivation for allowing consumers a choice of energy suppliers is to enable retail customers to take advantage of increased competition between suppliers in the open market.  The fundamental purpose behind this policy is that competition would result in ARESs being more aggressive and creative than the utility in reducing wholesale purchasing costs and thereby lower prices for retail customers.

11.     Consumers who do not choose to switch to an ARES for their energy supply continue to receive their supply from their local utility.

12.     In Illinois, the Illinois Power Agency develops electricity procurement plans and conducts competitive electricity procurement processes on behalf of Illinois utilities in order to ensure that utility customers receive competitive retail rates for electricity.

13.     A third-party consultant manages competitive procurement auctions on behalf of the Illinois Power Agency.  Through these events, utilities purchase electricity at competitive wholesale prices on a multi-year rolling basis (which Illinois refers to as a "laddered" approach) on behalf of its customers.  The bidding processes and results are made publicly available.  As a result, these auctions reflect market-determined prices based on prevailing market conditions.  Utilities then charge their customers a rate based on market prices for supply obtained in the competitive wholesale marketplace, plus other wholesale costs, namely transmission, capacity, ancillary, congestion, and administrative costs (*i.e.*, the same costs ARESs such as Spark Energy incur) -- without any markup or profit.  Because Illinois utility rates do not include any profits, they serve as pure reflections of average market costs of wholesale electricity and associated costs over time.

14.     By contrast, ARESs such as Defendant have various options to buy electricity at wholesale for resale to retail customers, including: owning electricity production facilities;

purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance of the time it is used by consumers, for example purchasing futures contracts for the delivery of electricity in the future at a predetermined price. The purpose of deregulation is to allow ARESs to use these and other innovative purchasing strategies to reduce electricity costs, and pass those savings on to consumers.

15.     Therefore, ARESs should be able to offer rates competitive with, or substantially lower than, utilities' rates, and in fact many do. Indeed, Spark Energy offered fixed rates during the time Plaintiff was a Spark Energy customer that were competitive with or much lower than Illinois utilities' rates.

16.     As part of the deregulation plan, ARESs (like Spark Energy) do not have to file or seek approval for the electricity rates they charge or the methods by which they set their rates with the Illinois Commerce Commission.

17.     Spark Energy exploits deregulation and the lack of regulatory oversight in the energy market to deceptively charge consumers exorbitant rates for electricity. In fact, Defendant's rates are substantially higher than its own fixed rates, rates charged by other ARES, and rates charged by local utilities, and are untethered from changes in wholesale prices.

18.     As any reasonable consumer would expect, there are only two aspects of market conditions that affect Spark Energy's sales of electricity to consumers: supply side, as reflected in the state of wholesale market pricing (wholesale costs make up the vast majority of ARESs' costs to provide retail electricity) and demand side, as reflected in the rates Spark Energy's competitors charge other retail customers.

19.     In or around February 2012, Spark Energy offered to provide Mr. Harty a fixed rate to be followed by a market-based variable rate for electricity services.  Spark Energy's fixed rate offer was lower than his local utility's (ComEd) then-current rate.

20.     After Mr. Harty expressed interest in enrolling in Spark Energy's electricity services, Spark Energy provided him with its standard customer Uniform Disclosure Statement and Terms of Service.

21.     The representation that Defendant's variable rate would be based on market conditions was reinforced by Defendant's standard Terms of Service, which, after the rescission period, would come to govern their relationship.  Specifically, the Terms of Service prominently stated that, upon the expiration of the initial fixed rate, Plaintiff would be automatically transferred to Spark Energy's variable rate plan, "where your rate may vary according to market conditions."  That is, Spark Energy represented that the new variable rate "may vary" from the expired fixed rate "according to market conditions."

22.     The Terms of Service also provided Mr. Harty with a rescissionary period during which he could rescind the contract prior to its commencement should he not agree to its terms. During that rescissionary period, the contract served as a solicitation in which Defendant identified the basis upon which the promised market-based variable rate would be determined.

23.     Spark Energy sends a uniform renewal letter to all of its customers whose fixed rates are expiring, in which it represents that Spark Energy has "competitively priced offers."

24.      Any reasonable consumer would understand based on these representations that Defendant's variable rate would be competitive and vary from the initial fixed rate according to changes in market conditions.  Any reasonable consumer would understand that the primary, if not sole, components of market conditions is wholesale prices and the retail prices other

competitors (namely the local utility and other ARESs) charge. Mr. Harty thus reasonably expected that Spark Energy's variable rates for electricity would only vary from his initial rate based on market conditions, *i.e.*, the rates Spark Energy's competitors charge and wholesale costs for purchasing electricity.

25.     But such a consumer would be wrong, because Spark Energy's variable rate does not reflect changes in wholesale electricity prices and it is invariably substantially higher than competitors' rates.

26.     The following table identifies the last 23 billing periods (beginning in January 2017) during which Mr. Harty was enrolled in Spark Energy's electricity services, the variable rate Spark Energy charged Mr. Harty, the corresponding rate ComEd would have charged (which, as discussed above, is a reasonable representation of a rate based on wholesale market conditions), and the differences between Spark Energy's and ComEd's contemporaneous rates:

| Billing Period | Spark Energy Rate Per kWh[1] | ComEd Rate Per kWh | Difference Per kWh | Percent Difference |
|---|---|---|---|---|
| 1/4/17 – 2/3/17 | $0.1309 | $0.05818 | $0.07272 | 124.99% |
| 2/3/17 – 3/6/17 | $0.1309 | $0.05818 | $0.07272 | 124.99% |
| 3/6/17 – 4/4/17 | $0.1309 | $0.06185 | $0.06905 | 111.64% |
| 4/4/17 – 5/3/17 | $0.1409 | $0.05818 | $0.08272 | 142.18% |
| 5/3/17 – 6/2/17 | $0.1409 | $0.06161 | $0.07929 | 128.70% |
| 6/2/17 – 7/3/17 | $0.14089 | $0.07044 | $0.07045 | 100.01% |
| 7/3/17 – 8/2/17 | $0.13993 | $0.06969 | $0.07024 | 100.79% |
| 8/2/17 – 8/31/17 | $0.13991 | $0.07082 | $0.06909 | 97.56% |
| 8/31/17 – 9/29/17 | $0.1399 | $0.07103 | $0.06887 | 96.96% |
| 9/29/17 – 10/30/17 | $0.13991 | $0.06649 | $0.07342 | 110.42% |
| 10/30/17 – 11/30/17 | $0.1399 | $0.06649 | $0.07341 | 110.41% |
| 11/30/17 – 1/3/18 | $0.13989 | $0.06649 | $0.0734 | 110.39% |
| 1/3/18 – 2/2/18 | $0.1399 | $0.06786 | $0.07204 | 106.16% |
| 2/2/18 – 3/5/18 | $0.15088 | $0.07485 | $0.07603 | 101.58% |
| 3/5/18 – 4/3/18 | $0.1599 | $0.06898 | $0.09092 | 131.81% |
| 4/3/18 – 5/2/18 | $0.1599 | $0.06695 | $0.09295 | 138.83% |
| 5/2/18 – 6/1/18 | $0.1599 | $0.06818 | $0.09172 | 134.53% |
| 6/1/18 – 7/2/18 | $0.1599 | $0.07334 | $0.08656 | 118.03% |
| 7/2/18 – 8/1/18 | $0.1599 | $0.07051 | $0.08939 | 126.78% |
| 8/1/18 – 8/30/18 | $0.15989 | $0.0727 | $0.08719 | 119.93% |
| 8/30/18 – 10/1/18 | $0.1599 | $0.06993 | $0.08997 | 128.66% |
| 10/1/18 – 10/30/18 | $0.1599 | $0.06792 | $0.09198 | 135.42% |
| 10/30/18 – 11/30/18 | $0.15989 | $0.06792 | $0.09197 | 135.41% |

---

[1] Electricity is sold to consumers by the kilowatt hour, or kWh.

27.     As explained above, ComEd is Spark Energy's primary competitor in Mr. Harty's service territory, and ComEd's rates encompass the average wholesale price of electricity over time and associated costs without any markup, making it an ideal comparator.

28.     That Spark Energy's variable rate is not in fact a competitive market rate is demonstrated by the fact that Defendant's rate was consistently significantly higher than ComEd's rates.  Between January 2017 and November 2018, Spark Energy's rate was higher than ComEd's rate *every single month*.  On average, during this period, Spark Energy's rates were 119% higher than ComEd's rates.  Spark Energy's rate was *more than double* ComEd's rate during 21 of these 23 months.

29.     Spark Energy's failure to base is variable rate on market conditions is likewise evidenced by the variable rate's failure to fluctuate in accordance with changes in ComEd's (*i.e.*, its primary competitor's) rate.

30.     Remarkably, Spark Energy almost never lowered its rate from the preceding month, in contrast to fluctuating market conditions, demonstrating that the representation that the rates "may" vary according to market conditions is false and misleading because they rarely if ever vary according to market conditions.

31.     The discrepancies between fluctuations in Spark Energy's variable rate and utility prices remain evident throughout Mr. Harty's last two years on the variable rate.  For example, whereas ComEd's rate decreased from $0.07485 to $0.06695 per kWh (declining by 11%) from February to April 2018, Spark Energy's rate increased its already exorbitant rate from $0.15088 to $0.1599 per kWh (increasing by 6%).  Likewise, between August and November 2018, ComEd's rate steadily decreased from $0.0727 to $0.06792 per kWh (decreasing 7%), while

Spark Energy's rate increased from $0.1589 to $0.1599 per kWh and subsequently decreased back to $0.1589 per kWh during the same period.

32. Even when the rates trended in the same direction, the differences remain evident. For instance, between August and December 2017, ComEd's rate steadily decreased from $0.07103 to $0.06649 per kWh (decreasing 6%), whereas Spark Energy's rate merely decreased from $0.1399 per kWh to $0.1389 per kWh (decreasing 0.7%).

33. A reasonable consumer would understand that a price based on market conditions would be competitive with the price charged by Spark Energy's competitors' rates, namely its primary competitor ComEd. But Spark Energy's variable rate was never competitive with ComEd's rate. Thus, Spark Energy's rates are not in fact based on market conditions or competing prices otherwise available in the market.

34. Moreover, Spark Energy has a tactical advantage over the utility as it can purchase electricity from any number of markets using any number of purchasing and hedging strategies, and therefore its cost for purchasing electricity should at the very least reflect -- if not undercut -- utility prices.

35. Instead, Spark Energy's rates are unfathomably and consistently higher than the local utility's rates.

36. Spark Energy's variable rate was also consistently substantially higher than other electricity rates available in the market, including its own fixed rates and introductory rates.

37. Not surprisingly, Spark Energy's rates are not competitive with those of other ARESs either. In fact, according to U.S. Energy Information Administration's data, in 2016, Spark Energy's rates were higher than approximately 92% of the 52 ARESs providing residential

electricity services in Illinois. *See 2016 Retail Power Marketers Sales -- Residential*, U.S.

ENERGY INFORMATION ADMINISTRATION, http://bit.ly/2pgWXpO (last visited Feb. 27, 2019).

38. A reasonable consumer would also understand and expect that "market

conditions" for retail electricity would include the wholesale price for electricity, that is, the

market price available to Spark Energy for the electricity it in turn supplies to its retail

customers.

39. However, Spark Energy's variable rate never varies with wholesale market prices.

40. The following table identifies the most recent 23 billing periods during which Mr.

Harty was enrolled in Spark Energy's variable rate, Spark Energy's variable rates for that period,

the "Weighted LMP Plus Other Wholesale Costs," and the differences between Spark Energy's

rates and contemporaneous wholesale prices. The locational marginal price ("LMP") is the

benchmark used to establish the price of electricity purchases and sales in specific geographic

locations. The "Weighted LMP Plus Other Wholesale Costs" below reflects the Day-Ahead

LMP adjusted upward to reflect that more electricity is purchased when demand, and

consequently the LMPs, are higher, and also includes the other wholesale costs an ARES incurs

for selling electricity (namely transmission, capacity, ancillary, and congestion costs) in

ComEd's service territory. PJM is the market administrator and updates the market rate on an

hourly basis. Spark Energy was and is capable of purchasing electricity at wholesale at these

prices.

| Billing Period | Spark Energy Rate Per kWh[2] | Weighted LMP Plus Other Wholesale Costs Per kWh | Difference Per kWh | Percent Difference |
|---|---|---|---|---|
| 1/4/17 – 2/3/17 | $0.1309 | $0.0667 | $0.0642 | 96% |
| 2/3/17 – 3/6/17 | $0.1309 | $0.0442 | $0.0867 | 196% |
| 3/6/17 – 4/4/17 | $0.1309 | $0.0505 | $0.0804 | 159% |
| 4/4/17 – 5/3/17 | $0.1409 | $0.0443 | $0.0966 | 218% |
| 5/3/17 – 6/2/17 | $0.1409 | $0.0488 | $0.0921 | 189% |
| 6/2/17 – 7/3/17 | $0.14089 | $0.0506 | $0.0903 | 178% |
| 7/3/17 – 8/2/17 | $0.13993 | $0.0519 | $0.0881 | 170% |
| 8/2/17 – 8/31/17 | $0.13991 | $0.0466 | $0.0933 | 200% |
| 8/31/17 – 9/29/17 | $0.1399 | $0.0460 | $0.0939 | 204% |
| 9/29/17 – 10/30/17 | $0.13991 | $0.0455 | $0.0944 | 208% |
| 10/30/17 – 11/30/17 | $0.1399 | $0.0423 | $0.0976 | 231% |
| 11/30/17 – 1/3/18 | $0.13989 | $0.0432 | $0.0967 | 224% |
| 1/3/18 – 2/2/18 | $0.1399 | $0.0397 | $0.1002 | 252% |
| 2/2/18 – 3/5/18 | $0.15088 | $0.0386 | $0.1123 | 291% |
| 3/5/18 – 4/3/18 | $0.1599 | $0.0429 | $0.1170 | 273% |
| 4/3/18 – 5/2/18 | $0.1599 | $0.0454 | $0.1145 | 252% |
| 5/2/18 – 6/1/18 | $0.1599 | $0.0378 | $0.1221 | 323% |
| 6/1/18 – 7/2/18 | $0.1599 | $0.0437 | $0.1162 | 266% |
| 7/2/18 – 8/1/18 | $0.1599 | $0.0492 | $0.1107 | 225% |
| 8/1/18 – 8/30/18 | $0.15989 | $0.0493 | $0.1106 | 224% |
| 8/30/18 – 10/1/18 | $0.1599 | $0.0487 | $0.1112 | 228% |
| 10/1/18 – 10/30/18 | $0.1599 | $0.0462 | $0.1137 | 246% |
| 10/30/18 – 11/30/18 | $0.15989 | $0.0538 | $0.1061 | 197% |

---

[2] Electricity is sold to consumers by the kilowatt hour, or kWh.

41.     The disconnect between changes in wholesale prices and Spark Energy's variable rate demonstrates that Spark Energy's rates do not reflect changes in market conditions.  For example, the wholesale price of electricity significantly declined from $0.0519 per kWh in July 2017 to $0.0386 per kWh in February 2018, a reduction of 26%, while Spark Energy's rates remained constant around $0.1399 throughout the eight-month period.  Likewise, between March and May 2018, wholesale prices declined from $0.0429 to $0.0378 per kwh, declining 12%, while Spark Energy's rate remained at $0.1599 per kwh.  The discordance remained evident through Mr. Harty's final months with Spark Energy.  Between August and October 2018, wholesale costs decreased from $0.0493 to $0.0462, decreasing by 6%, while Spark Energy's variable rate increased from $0.1589 to $0.1599 per kwh.

42.     No reasonable consumer who is told that their variable rate may vary according to market conditions would expect that Spark Energy's rate would consistently remain constant or increase despite decreases in the wholesale price of electricity.

43.     Spark Energy is aware that its variable rate does not fluctuate in accordance with market conditions and that it makes no efforts to ensure that its rates are competitive, in spite of its representations to its consumers.

44.     No reasonable customer, including Mr. Harty, would interpret "market conditions" to mean that Spark Energy can exercise unfettered discretion to artificially inflate its rates  -- so much so that the rates bear no resemblance to wholesale costs and competitors' rates -- in order to maximize profits at the expense of its customers.

45.     Spark Energy further deceives its variable rate customers by charging them monthly administrative fees in direct contravention of the terms of Spark Energy's contract.

46.     According to Spark Energy's standard Terms of Service, "[y]ou may also pay a monthly administrative fee, the amount of which, if applicable, is disclosed in your UDS [Uniform Disclosure Statement] or Electric Service Agreement."

47.     Mr. Harty's standard Uniform Disclosure Statement did not disclose a monthly administrative fee.  Notwithstanding the explicit terms of his agreement with Spark Energy, soon after shifting Mr. Harty to its variable rate, Spark Energy intentionally began charging Mr. Harty a monthly administrative fee ranging from $4.95 to $6.95 per month.  Spark Energy knows when it represents that no fee will be charged absent a Uniform Disclosure Statement or Electronic Service Agreement disclosure that it will in fact charge such a fee, irrespective of whether it is disclosed.

48.     Spark Energy's statements regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer who knows the truth about Spark Energy's exorbitant rates would choose Spark Energy as an electricity supplier.  All that Spark Energy offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other ARESs or local utilities.  Other than potential price savings, there is nothing to differentiate Spark Energy from other ARESs or local utilities, and the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with Spark Energy.

49.     Spark Energy knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on market conditions were made for the sole purpose of inducing customers to purchase electricity from Spark Energy so that it can reap outrageous profits to the direct detriment of consumers

without regard to the consequences high utility bills cause such consumers. Therefore, Spark Energy's actions were actuated by actual malice or accompanied by wanton and willful disregard for the well-being of consumers.

### Rule 9(b) Allegations

50. To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

51. WHO:

- Spark Energy, acting through its corporate personnel, makes material misrepresentations and omissions of fact in the marketing, advertising, promotion, and sale of electricity.

52. WHAT:

- Spark Energy makes material misrepresentations and omissions by marketing, advertising, promoting, and selling its variable rate as a competitively-priced rate that "may vary according to market conditions."

- The language that Spark Energy uses in its Terms of Service and renewal letters falsely and deceptively creates the impression that its variable rate would vary based on changes in wholesale costs of electricity and competitors' rates. Spark Energy makes these misrepresentations with respect to its variable rate even though it knows that its variable rate will not vary based on market conditions as the variable rate does not fluctuate based on changes in competitors' rates or wholesale rates. Spark Energy fails to inform customers that there are numerous

factors it considers that are not market conditions as any reasonable consumer would understand that term.

- Indeed, Spark Energy knows that its representation that the variable rate is competitive and based on market conditions is false because it does not meaningfully consider the rates charged by utilities or other ARESs when it sets the variable rate. No reasonable consumer exposed to Spark Energy's representations would expect that there would be no connection between market conditions and Spark's variable rates.

- Spark Energy engages in additional misrepresentations and omissions in its solicitations by falsely and deceptively stating that, "[y]ou may also pay a monthly administrative fee, the amount of which, if applicable, is disclosed in your UDS [Uniform Disclosure Statement] or Electric Service Agreement." Notwithstanding, Spark Energy knows that it will charge customers a monthly administrative fee without first disclosing the fee in either the Uniform Disclosure Statement or Electric Service Agreement.

53.   WHERE:

- Spark Energy makes its material misrepresentations and omissions in its standard Uniform Disclosure Statement and Terms of Service, which constitute a solicitation during the rescission period, and in Spark Energy's standard renewal notice, all of which were received by Plaintiff and upon which Spark Energy intended Plaintiff to rely.

54.   WHEN:

- Spark Energy made the material misrepresentations and omissions when it solicited Mr. Harty in February of 2012 by providing him with its deceptive standard Uniform Disclosure Statement and Terms of Service, and again when it sent Mr. Harty its standard renewal notice guaranteeing competitively-priced rates. Spark Energy makes the same or substantially similar misrepresentations and omissions of material facts to all of its potential customers when it solicits them by using the same or substantially similar Uniform Disclosure Statement, Terms of Service, and renewal notice.

55. WHY:

- Knowing that price is the most fundamental factor in choosing an energy supplier, Spark Energy makes these claims with respect to its variable rate with the purpose of inducing Mr. Harty and other prospective customers to switch to its electricity supply services. By deceptively inducing customers to switch to its energy supply, Spark Energy has successfully reaped millions in profits at the expense of its unsuspecting customers.

56. HOW:

- Spark Energy makes material misrepresentations and fails to disclose material facts concerning its variable rate when marketing, advertising, promoting, and selling its electricity services by representing that its variable rate is a competitively-priced rate that "may vary according to market conditions." In reality, Spark Energy makes no effort to price its variable rate competitively with either the local utilities or competing ARESs, and there is no correlation between Spark Energy's variable rate and market conditions. Instead, Spark Energy's rate

is consistently higher than that of its primary competitor (the local utility) as well as rates charged by other ARESs, and is invariably higher than its own teaser and fixed rates. Spark Energy further fails to disclose that it artificially inflates its monthly rates, which are realized as profits.

- Spark Energy also fails to disclose that it charges customers a monthly administrative fee, despite its explicit representations otherwise.

### Class Action Allegations

57. Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of Spark Energy customers in Illinois who were charged a variable rate for residential electricity services by Spark Energy from March 2009 to the present (the "Class).

58. Excluded from the Class is Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

59. This action is brought as a class action for the following reasons:

a. The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b. There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

i. whether Defendant violated 815 Ill. Comp. Stat. Ann. § 505/1 *et seq*.;

ii.     whether Defendant breached its contracts with consumers by charging variable rates not based on market conditions;

iii.     whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.*, to price gouge or upset the reasonable expectation of consumers that Spark Energy variable rates would be competitive and reflect changes in the wholesale price of electricity;

iv.     whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

v.     whether Defendant should be enjoined from continuing to charge exorbitant rates based on factors other than market conditions.

c.     The claims asserted by Plaintiff are typical of the claims of the members of the Class;

d.     Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ARESs;

e.     Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

f.     Defendant has acted on grounds that apply generally to the Class, namely representing that its variable rates are based on market conditions when its rates are in fact always substantially higher, so that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Class as a whole;

g.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.  Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

ii.  It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

iii.  When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class;

iv.  A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

v.  The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi.  Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

60.  Defendant's violations of 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.* and the common law are applicable to all Class Members, respectively, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

**FIRST CAUSE OF ACTION**
**Violation of 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.***

61.  Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs 1 through 60 as if fully set forth herein.

62.     The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits,

*inter alia*:

> Unfair methods of competition and unfair or deceptive acts or practices, including
> but not limited to the use or employment of any deception, fraud, false pretense,
> false promise, misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the concealment, suppression or
> omission of such material fact . . .

815 Ill. Comp. Stat. Ann. § 505/2.

63.     Defendant's unfair and false, deceptive, and misleading statements and omissions

with respect to the rates charged for electricity, as described above, constitute affirmative

misrepresentations in connection with the marketing, advertising, promotion, and sale of

electricity in violation of the Consumer Fraud and Deceptive Business Practices Act.

64.     Defendant's unfair and false, deceptive, and misleading statements and omissions

would have been material to any potential consumer's decision to purchase electricity from

Defendant.

65.     Defendant also failed to inform customers that its rates are substantially higher

than those based on market conditions.  Defendant further failed to disclose that its variable rates

were artificially inflated to maximize profits at the expense of its customers.  That information

would have been material to any consumer deciding whether to purchase electricity from

Defendant.

66.     Additionally, Spark Energy unfairly, falsely, deceptively, and misleadingly

promised that it would not charge its customers a monthly administrative fee without first

disclosing the fee in either the Uniform Disclosure Statement or Electric Service Agreement.

67.     Notwithstanding, Spark Energy charged customers a monthly administrative fee

without first disclosing the fee in either the Uniform Disclosure Statement or Electric Service

Agreement.

68.     Defendant made these unfair, false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

69.     Defendant's price gouging scheme, which often affects Illinois' most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous. Victims of Spark Energy's scheme cannot avoid it; once Spark Energy has charged its exorbitant rate, consumers can only pay the amount charged or risk having their electricity shut off. In Illinois, this can be a life-threatening issue in the depths of the summer and winter. Moreover, Spark Energy's customers are not informed that Spark Energy is price gouging them, and reasonable consumers paying a market-based variable rate trust that the ARES providing them service will not charge a rate divorced from market conditions about which they are not, as private individuals, ordinarily privy. That Spark Energy's rates are higher than rates charged by 9 out of 10 other ARES proves how its roguish behavior is outside of the commercial norm.

70.     Defendant's price gouging scheme offends public policy as well. The purpose of deregulation is to allow ARES like Spark Energy to offer competitive rates to the benefit of consumers. Spark Energy offers nothing of value to consumers; instead, it callously takes advantage of deregulation, and the difficulty consumers face in determining when market conditions change such that a market variable rate should be higher or lower, to charge outrageously high rates, secure in the knowledge that the public utility commission no longer has the authority to curb its behavior.

71.     Spark Energy's price gouging behavior causes consumers significant and substantial pecuniary injury.

72.     Plaintiff and other Class Members entered into agreements to purchase electricity

from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the Consumer Fraud and Deceptive Business Practices Act.

73.     As a consequence of Defendant's wrongful actions, Plaintiff and the other Class Members suffered an ascertainable monetary loss based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a competitive rate based on market conditions or had they not switched to Defendant from their previous supplier, and well as any monthly fees assessed by Defendant.

74.     Plaintiff and other Class Members suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates and fees had been known.

75.     By reason of the foregoing, Defendant is liable to Plaintiff and other Class Members for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit.  815 Ill. Comp. Stat. Ann. § 505/10(a).

76.     Defendant knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on market conditions were made for the sole purpose of inducing consumers to purchase electricity from it so it can reap outrageous profits to the direct detriment of Illinois consumers and without regard to the consequences high utility bills cause such consumers.  Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other Class Members.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Violation of 815 Ill. Comp. Stat. Ann. § 505/2GG

77.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78.     The Illinois Consumer Fraud and Deceptive Business Practices Act requires that "[a]ny advertisement for electric service that lists rates shall clearly and conspicuously disclose all associated costs for such service including, but not limited to, access fees and service fees." 815 Ill. Comp. Stat. Ann. § 505/2GG.

79.     "The term 'advertisement' includes the attempt by publication, dissemination, solicitation or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise and includes every work device to disguise any form of business solicitation by using such terms as 'renewal', 'invoice", 'bill', 'statement', or 'reminder', to create an impression of existing obligation when there is none, or other language to mislead any person in relation to any sought after commercial transaction." 815 Ill. Comp. Stat. Ann. 505/1(a).

80.     During the rescissionary period, Spark Energy's Uniform Disclosure Statement and Terms of Service serves as a solicitation in which Defendant identifies the purported market-based pricing methodology for its variable rate.  The solicitation further represents that Spark Energy will not charge customers administrative fees absent a Uniform Disclosure Statement or Electronic Service Agreement disclosure that it will in fact charge such fees.

81.     Defendant's solicitations failed to clearly and conspicuously disclose Spark Energy's variable rate pricing methodology and associated costs for electricity services including, *inter alia*, its administrative fees.

82.     Plaintiff and other Class Members suffered an ascertainable loss caused by

Defendant's unfair misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates and fees had been known.

83.     By reason of the foregoing, Defendant is liable to Plaintiff and other Class Members for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit.  815 Ill. Comp. Stat. Ann. § 505/10(a).

84.     Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other Class Members.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### Breach of Contract & Breach of the Implied Covenant of Good Faith and Fair Dealing

85.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 84 as if fully set forth herein.

86.     Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity supply.

87.     Pursuant to that contract, Defendant agreed to charge a variable rate for electricity that "may vary according to market conditions."

88.     Defendant also promised that it would not charge customers a monthly administrative fee without prior disclosure in its Uniform Disclosure Statement or Electric Service Agreement.

89.     Pursuant to the contract, Plaintiff and the Class agreed to pay Defendant's rate, and they did so.

90.     However, Defendant failed to perform its obligations under the contract because it

charged a variable rate not based on market conditions, including the wholesale price of energy.

91.    Defendant further breached its contract by charging Plaintiff and Class Members monthly administrative fees in direct contravention of the terms of Spark Energy's customer contract.

92.    Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based the rate on market conditions, as well as monthly administrative fees.

93.    By reason of the foregoing, Defendant is liable to Plaintiff and the rest of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

94.    Additionally, every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

95.    Plaintiff reasonably expected that Defendant would attempt to make a reasonable profit in setting its rates and selling electricity to consumers.  Nonetheless, Plaintiff reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect market conditions, including competing rates and the wholesale price of electricity, and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity from Defendant.

96.    Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations that the variable rate for electricity would reflect market conditions, including competing rates and wholesale electricity

prices.

97.     As a result of Defendant's breach, Defendant is liable to Plaintiff and other Class

Members for actual damages in an amount to be determined at trial and attorney's fees.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment

98.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through

97 above as if fully set forth herein.

99.     This cause of action is pled in the alternative to Plaintiff's contract claims.  To the

extent the Court determines that a valid contract exists between the parties, Plaintiff does not

intend to proceed with his unjust enrichment claim.

100.     Plaintiff and the Class members conferred a tangible economic benefit upon

Defendant by contracting with Defendant for electricity.  Plaintiff and the Class Members would

not have contracted with Defendant for electricity had they known that Defendant would charge

rates substantially in excess of those charged by local utilities.

101.     By engaging in the conduct described above, Defendant has unjustly enriched

itself and received a benefit beyond what was contemplated by the parties, at the expense of

Plaintiff and the Class.

102.     It would be unjust and inequitable for Defendant to retain the excessive payments

Plaintiff and the Class made for electricity supply.

103.     By reason of the foregoing, Defendant is liable to Plaintiff and the other Class

Members for the damages that they have suffered as a result of Defendant's actions, the amount

of which shall be determined at trial.

WHEREFORE, Plaintiff respectfully requests that the Court should enter judgment

against Defendant as follows:

1.      Ordering appropriate injunctive relief;

2.      Certifying this action as a class action, with a class as defined above;

3.      On Plaintiff's First Cause of Action, awarding against Defendant damages that Plaintiff and other Class Members have suffered, trebled, and granting appropriate injunctive relief;

4.      On Plaintiff's Second Cause of Action, awarding against Defendant damages that Plaintiff and other Class Members have suffered, trebled, and granting appropriate injunctive relief;

5.      On Plaintiff's Third Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions;

6.      On Plaintiff's Fourth Cause of Action, awarding against Defendant damages that Plaintiff and other members of the Class have suffered as a result of Defendant's actions;

7.      Awarding Plaintiff and the Class punitive damages;

8.      Awarding Plaintiff and the Class interest, costs and attorneys' fees; and

9.      Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by jury.

Dated: March 27, 2019
     Chicago, Illinois

       By:  _____

          Richard R. Gordon
          **GORDON LAW OFFICES, LTD.**
          111 West Washington Street
          Suite 1240
          Chicago, Illinois 60602
          Tel: (312) 332-5200
          Fax: (312) 242-4966
          rrg@gordonlawchicago.com

          *Attorneys for Plaintiff and Putative Class*